UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JOY HAILE,

                Plaintiff,

-against-

566 NOSTRAND AVE. INC. d/b/a AMOUR CABARET, MICHAEL A. FRANKLIN JR. and MICHAEL J. LABOY,

                Defendants.

**MEMORANDUM AND ORDER**
20-CV-2842 (LDH) (CLP)

---

LaSHANN DeARCY HALL, United States District Judge:

    Joy Haile ("Plaintiff") brings the instant action against Defendants 566 Nostrand Ave. Inc. ("Amour"), Michael A. Franklin, Jr. ("Franklin"), and Michael J. Laboy ("Laboy") (collectively, "Defendants"), asserting claims pursuant to the Fair Labor Standards Act ("FLSA") and New York labor Law § 190 ("NYLL") for unpaid wages, unlawful deductions, wage statement and notice violations, and retaliation, and pursuant to the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") for race discrimination, hostile work environment, and retaliation.  Plaintiff moves pursuant to Federal Rule of Civil Procedure 56, for summary judgment on all her claims.  Defendants cross-move, pursuant to Rule 56, for summary judgment to dismiss this action in its entirety.

1

## UNDISPUTED FACTS[1]

Franklin owns and operates Amour, a Brooklyn nightclub that provides food, hookah, bottle service, and music. (Pl.'s Reply Defs.' Stmt. Uncontested Facts Mot. Sum. J. ("Pl.'s 56.1 Stmt. Reply") ¶¶ 1, 8, 49, ECF No. 28-4.) When Franklin first opened Amour sometime in 2018, he hired his long-time friend, Laboy, who worked there as a consultant through October 2019. (*Id.* ¶ 70.)

Amour is open each day of the week, between 11:00 p.m. and 4 a.m. (*Id.* ¶ 135.) At its maximum capacity, the club can serve up to 150 customers at a given time. (*Id.* ¶ 7.) Amour is also a cash-only business. It charges customers a cash entrance fee and does not accept credit cards for purchases made inside the club. (*Id.* ¶¶ 10, 20.) It purchases food for resale and hookah supplies in cash. (*Id.* ¶ 13.) And, it pays its workforce in cash. (*Id.* ¶ 17, 32, 34.)

Plaintiff was one of approximately twenty to thirty bartenders Amour staffed throughout the months of January and February of 2020. (*Id.* ¶¶ 5, 83.) Plaintiff picked up these shifts while also working two other jobs. (*Id.* ¶ 156.) With Amour, Plaintiff did not have a set schedule and instead received shifts informally and on an ad hoc basis through an iPhone text message chat, wherein one of the supervisors, Mychal, would confer with her about scheduling each shift. (*Id.* ¶¶ 85, 154, 157.) Throughout January and February of 2020, Plaintiff worked six or seven shifts, and she was paid exclusively in the tips she earned for each shift. (*Id.* ¶¶ 148, 161.) Although the parties dispute the exact timing, each shift began and ended at a set time each night. (*Id.* ¶ 86.)

---

[1] The following facts are taken from the parties' statements of material fact pursuant to Local Rule 56.1 and annexed exhibits. Unless otherwise noted, the facts are undisputed.

Amour did not have any written guidelines, but there were rules and consequences for failure to adhere to them. For example, if Plaintiff was late for a shift, she was required to pay a $50 fee to her manager. (*Id.* ¶ 29–30, 88.) Plaintiff was also required to wear a "uniform" which consisted of a dress and high heels. (*Id.* ¶¶ 48.C–D, 101–102, 114.) Bartenders had the option to choose their own uniform or rent an outfit each night of their shift for $50 to $60. (*Id.* ¶¶ 38, 145.) On each night she worked, Plaintiff paid for an outfit prepared by the tailor provided by Amour. (*Id.* ¶ 145.)

During Plaintiff's last shift at Amour in February 2020, Plaintiff took off her heels and replaced them with a pair of boots. (*Id.* ¶ 166.) The parties dispute whether her manager, Jocelyn, gave Plaintiff permission to switch her boots. (*Id.*) In any event, Plaintiff was removed from the iPhone chat where she received shifts the day after this exchange. (*Id.* ¶ 116.) Thereafter, Plaintiff reached out to Laboy, who she believed was the owner of Amour, to find out why she was removed from the scheduling chat. (*Id.* ¶¶ 116.) Laboy did not confirm that he was the owner, (*id.* ¶ 184), but he did advise Plaintiff that he was in the scheduling chats, (*id.* ¶ 62), and he told her that "every single black bartender has complained about heels", that "all black girls want to know why they don't get hired at strip clubs as bartenders", that "it's really beyond difficult to deal with black bartenders", that "it's one of the 100 percent why the bartenders everywhere are Spanish," (*id.* ¶ 117), and that "this is why black bartenders don't get hired anywhere," (*id.* ¶ 119).

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] are entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see*

3

*also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 23 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Where the non-movant bears the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Celotex Corp.*, 477 U.S. at 325. Once the movants meet their initial burden, the non-movant may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movant and draw all justifiable inferences in his favor, *Anderson*, 477 U.S. at 255, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts. *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

## DISCUSSION

### I. FLSA Claims

Defendants argue that they are entitled to judgment as a matter of law on Plaintiff's FLSA claim because she is not an employee as a matter of law under the FLSA. (Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") at 2–6, ECF No. 28-5.) The Court disagrees.

The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "In light of the definition's circularity, courts have endeavored to distinguish between employees and independent contractors based on factors crafted to shed light on the

4

underlying economic reality of the relationship." *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 139 (2d Cir. 2017). The Second Circuit has held that five factors bear on the "economic reality" of an employment relationship: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058–59 (2d Cir. 1988). The goal in weighing these factors is to determine "as a matter of economic reality, [whether] the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Id.* at 1059.

As to the first factor, the record shows that Amour exerted a substantial degree of control over Plaintiff when she worked her shifts as a bartender there. Although it is undisputed that Amour did not issue written guidelines or require bartenders to work a set schedule, (Pl.'s 56.1 Stmt. Reply ¶¶ 85, 154), if Plaintiff was late for a shift, she was required to pay a $50 fee. (*Id.* ¶¶ 29–30, 88.) Courts have found that similar fines imposed on violations of rules are characteristic of an employment relationship. *See, e.g.*, *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 913 (S.D.N.Y. 2013) (noting that violations of an employer's guidelines were punishable by fines or discharge); *Clincy v. Galardi S. Enters., Inc.*, 808 F. Supp. 2d 1326, 1345 (N.D. Ga. 2011) (finding that club exerted control over its dancers when it had the authority to fine or discipline dancers for violations, even when it did not do so "consistently or uniformly"); *Thompson v. Linda and A. Inc.*, 779 F. Supp. 2d 139, 148 (D.D.C. 2011) (finding that the ability to punish dancers for violations of house rules through fines are indicative of club's control even when violations did not result in fines or fines were uncollected). Plaintiff was also required to

5

wear a uniform and Amour provided Plaintiff clothing and a tailor for a fee.  (Pl.'s 56.1 Stmt. Reply ¶¶ 48.C–D, 101–02, 114.)  And, there is evidence in the record to suggest that Plaintiff was terminated from Amour for violating the dress code.  (*Id.* ¶¶ 116, 166.)  These facts demonstrate that Amour exerted a level of control over its bartenders that is indicative of an employment relationship.

The second factor, Plaintiff's opportunity for profit or loss and her investment in the business, also suggests that she is an employee.  The profits Plaintiff earned for her work at Amour start and end with the tips she earned while on her shift.  Indeed, it is undisputed that tips were the *exclusive* means by which Plaintiff earned money at Amour.  (*Id.* ¶¶ 148, 161.)  With respect to investment, Amour provided its bartenders with the liquor, ice, glasses, and other bartending supplies.  (*Id.* ¶ 93.)  By contrast, Plaintiff's investment took the form of the $50 to $60 fee she paid for her uniform each night she worked at Amour.  (*Id.* ¶¶ 48.C–D.)  Other than that modest investment, however, Plaintiff did not have any independent opportunity for profit or loss, nor did she have any investment in Amour's business.  Such a small up-front investment, in addition to no independent opportunity for profit, weighs in favor of an employment relationship.  *See Ethelberth v. Choice Sec. Co.*, 91 F.Supp.3d 339, 351 (E.D.N.Y. 2015) (finding the fact that the plaintiff "did not have any independent opportunity for profit or loss, nor have any investment in" the defendant's business favored an employment relationship); *cf. Harrell v. Diamond Entertainment, Inc.,* 992 F. Supp. 1343, 1352 (M.D. Fla. 1997) ("As is the case with the zealous waiter at a fancy, four star restaurant, a dancer's stake, her take and the control she exercises over each of these are limited by the bounds of good service; ultimately, it is the restaurant that takes the risks and reaps the returns.").

The third factor, the degree of skill and independent initiative required to perform Plaintiff's work, also weighs in favor of finding an employment relationship between Plaintiff and Amour. The record is silent on the skill required to be a bartender. However, there is some indication that Amour did not prioritize bartenders with any specialize skills. Take, for example, the manner in which Plaintiff received her shifts. She joined an iPhone text message chat. (Pl.'s 56.1 Stmt. Reply ¶ 85.) And, Plaintiff testified by deposition that her ability to work at Amour was limited by a seniority system whereby longer-tenured bartenders took priority. (Defs.' Ex. 3, at 48:6–9, ECF No. 28-8.) While the Court appreciates that bartenders often are asked to be knowledgeable about the ingredients to a host of adult beverages, nothing in this record establishes that the bartenders at Amour required any prior training or experience at all. *Cf. Campos v. Zopounidis,* No. 09-cv-1138, 2011 WL 2971298, at *7 (D. Conn. July 20, 2011) ("Although he needed a driver's license in order to legally drive his vehicle for deliveries, the possession of a driver's license and the ability to drive an automobile is properly characterized as a 'routine life skill' that other courts have found to be indicative of employment status rather than independent contractor status.").

Defendants would have the Court believe that this factor weighs in favor of independent contractor status because "Plaintiff's payment was based on her own initiative and what she could earn" by promoting herself and "build[ing] a following for what she characterized as 'her bar' at Amour." (Defs.' Mem. at 5.) This argument is no different than the oft rejected "hustling" argument made by strip-club proprietors about dancers at their establishments. In *Hart v. Rick's Cabaret International, Inc.*, for example, the proprietor of a strip club argued that efforts by dancers to learn better "dancing style" and learn the clientele required significant skill and initiative. *Hart*, 967 F. Supp. 3d at 920. The court disagreed, concluding that such efforts

7

"is not skilled work." *Id.* (collecting cases); *see also Reich v. Circle C. Invest., Inc.*, 998 F.2d 324, 328 (5th Cir.1993) (holding that topless dancers "do not exhibit the skill or initiative indicative of persons in business for themselves"). Plaintiff's efforts to generate more tips from Amour patrons do not suggest that she is an independent contractor.

The fourth factor, the permanence or duration of the working relationship, favors an independent contractor relationship. Although there is a dispute as to whether Plaintiff worked six or seven shifts at Amour over a two-month period, the record is clear that Plaintiff worked no more than seven shifts. (Pl.'s 56.1 Stmt. Reply ¶¶ 148, 161.) Moreover, Plaintiff was free to, and in fact did, perform work for other businesses in the service industry. (*Id.* ¶ 156.) Such temporary and sporadic work is more characteristic of an independent contractor. *Hart*, 967 F. Supp. 3d at 921.

The fifth factor, the extent to which Plaintiff's work is an integral part of Amour's business, weighs in favor of an employee relationship. Amour is a nightclub that serves liquor, wine, beer, cider, and hookah and provides DJ music and dancers. (Pl.'s 56.1 Stmt. Reply ¶ 134.) Amour spends at least $3,000 or $4,000 each time it purchases alcohol for resale. (*Id.* ¶ 12.) Bartenders who serve that alcohol are clearly integral to Amour's success. *See, e.g.*, *Harrell*, 992 F. Supp. at 1352 ("Exotic dancers are obviously essential to the success of a topless nightclub.").

In sum, when looking at whether, as a matter of economic reality, Plaintiff depended upon someone else's business for the opportunity to render service or was in business for herself, it appears abundantly clear to the Court that Plaintiff depended on Amour for the opportunity to earn a wage. Therefore, Plaintiff is an employee under the FLSA.

Even if Plaintiff is an employee under the FLSA, Defendants argue that they are still entitled to summary judgment on Plaintiff's FLSA claim because Amour it does not meet the standard for coverage under FLSA. (Defs.' Mem. at 6–7.) The Court agrees.

For an employer to be liable for minimum wage violations under FLSA, engagement in interstate commerce, either by an employee or by the employer as a whole, is a prerequisite. *See* 29 U.S.C. § 206(a). A plaintiff may satisfy this requirement by showing "individual coverage" through the plaintiff's personal engagement in interstate commerce or "enterprise coverage" through the employer's engagement in interstate commerce. *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 120 (E.D.N.Y.2011) (collecting cases); *see also* 29 U.S.C. § 206(a). The term "enterprise" in the context of the statute means "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." 29 U.S.C. § 203(r). The plaintiff bears the burden of establishing FLSA coverage to prove employer liability. *Li v. Zhao*, 35 F. Supp. 3d 300, 305 (E.D.N.Y. 2014) (citing *Owusu v. Corona Tire Shop, Inc.*, No. 09-CV-3744, 2013 WL 1680861, at *3 (E.D.N.Y. Apr. 17, 2013)). Plaintiff has not established coverage under the FLSA.

Plaintiff advances an enterprise coverage theory of liability under the FLSA. (*See* Compl. ¶ 11, ECF No. 1.) However, nothing in the record demonstrates that Amour's revenues exceeded $500,000 in 2020, the year Plaintiff worked her shifts there. For example, no tax documentation for that year has been produced. At best, the record shows that Amour *could* have taken in more than $500,000 based on its capacity and the fees it charged patrons. But, any such speculation is undercut by the undisputed fact that Amour closed its business around March 7, 2020 due to the coronavirus pandemic and did not reopen until April 2, 2021. (Pl.'s 56.1 Stmt.

9

Reply ¶¶ 199–200.) Therefore, there is no genuine dispute of fact that Amour is not covered under FLSA.

## II. State Law Claims

Plaintiff also alleges several claims under New York State law. However, because the Court has dismissed Plaintiff's claims under federal law, it "decline[s] to exercise supplemental jurisdiction" over Plaintiffs' state law claims[because it" has dismissed all claims over which it has original jurisdiction." *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 121–22 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)) ("If the federal law claims are dismissed before trial . . . the state claims should be dismissed as well.").

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED.

SO ORDERED.

Dated: Brooklyn, New York  
      March 29, 2024

/s/ LDH  
LaSHANN DeARCY HALL  
United States District Judge